UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
SOUTHEASTERN DIVISION

| | |
|---|---|
| SANDRA KAY DENNIS,  )<br>)<br>Plaintiff,  )<br>)<br>v.  )<br>)<br>NANCY A. BERRYHILL,[1]  )<br>Acting Commissioner of Social Security,  )<br>)<br>Defendant.  ) | No. 1: 16 CV 47 DDN |

## MEMORANDUM

This action is before the court for judicial review of the final decision of the defendant Commissioner of Social Security denying the applications of plaintiff Sandra Kay Dennis for disability insurance benefits (DIB) and supplemental security income benefits (SSI) under Titles II and XVI of the Social Security Act, 42 U.S.C. §§ 401- 434, 1381-1385. The parties have consented to the exercise of plenary authority by the undersigned United States Magistrate Judge pursuant to 28 U.S.C. § 636(c). For the reasons set forth below, the final decision of the Commissioner is affirmed.

## I. BACKGROUND

Plaintiff was born in 1961 and was 53 years old at the time of her second hearing. (Tr. 71.) She filed applications for DIB and for SSI on February 26, 2013 and March 12, 2013, respectively. (Tr. 4, 205-06.) She alleged an August 20, 2009 onset date. (Tr. 4,

---

[1] Nancy A. Berryhill is now the Acting Commissioner of Social Security. Pursuant to Rule 25(d) of the Federal Rules of Civil Procedure, Nancy A. Berryhill is hereby substituted for Acting Commissioner Carolyn W. Colvin as the defendant in this suit. 42 U.S.C. § 405(g).

99.)[2] In her Disability Report, she alleged disability due to post-traumatic stress disorder (PTSD), acid reflux, bulging discs, depression, and irritable bowel syndrome (IBS). (Tr. 219.) Her applications were denied, and she requested a hearing before an ALJ. (Tr. 4, 128-36.)

On November 20, 2014, following a hearing, an ALJ found that plaintiff was not "under a disability" as defined in the Act. (Tr. 14-26.) The Appeals Council denied her request for review. (Tr. 5-8.) Thus, the decision of the ALJ stands as the final decision of the Commissioner.

## II. MEDICAL AND OTHER HISTORY

On June 10, 2009, plaintiff saw Carl F. Patty, D.O., gynecologist, for pelvic and low back pain and was prescribed an antibiotic for a possible bladder infection. On June 22, 2009, plaintiff saw Dr. Patty, noting her pelvic pain had improved but that she had both low back and right leg pain. (Tr. 510-11.)

On July 14, 2010, she saw Sonjay Joseph Fonn, D.O., a neurosurgeon, reporting that she had been experiencing back pain for about a year, which was worsening and radiating down her right leg. Dr. Fonn noted degenerative changes at L4/5 and L5/S1 with L4/5 being worse. Dr. Fonn recommended conservative treatment of physical therapy with epidural injections to be considered in the future. (Tr. 492-93.)

---

[2] Plaintiff previously filed applications for DIB and SSI on January 19, 2010, alleging an onset date of August 20, 2009. The applications were denied by an ALJ on May 4, 2011. (Court Transcript Index 1; Tr. 4, 91-103.) In this case, plaintiff alleged that she had been unable to work since August 20, 2009, prior to the last final denial of her previous claims. The ALJ noted that plaintiff had previously filed claims, but expressly found the determinations on those claims were not subject to reopening. (Tr. 4-5.) Absent a colorable constitutional claim, the Act does not authorize judicial review of a decision by the Commissioner applying res judicata or a decision of the Commissioner refusing to reopen a prior claim. See Boock v. Shalala, 48 F.3d 348, 351 (8th Cir. 1995); Brown v. Sullivan, 932 F.2d 1243, 1245-46 (8th Cir. 1991). No such constitutional claim was presented here and the ALJ's decision refusing to reopen the prior applications is not reviewable. Thus, the relevant time period for consideration of plaintiff's claims begins on May 5, 2011, the date after the last final denial of plaintiff's previous claims.

On August 19, 2010, plaintiff reported to Dr. Patty that prescribed exercises were increasing the soreness in her lower back and that she was also experiencing pelvic pain. (Tr. 512-13.)

On September 15, 2010, plaintiff saw Dr. Fonn, reporting that physical therapy helped somewhat, but that she wanted to try epidural injections. (Tr. 490.)

On September 23, 2010, plaintiff underwent an abdominal hysterectomy for pelvic pain and had no post-operative problems. She reported that she was having increased moodiness and that she did not feel Prozac, the antidepressant she was taking, was helpful. (Tr. 360-366, 514.)

In November 2010 plaintiff had additional epidural injections for her back pain. (Tr. 484-89.)

During a November 23, 2010 visit, plaintiff told Dr. Patty that she had stopped taking Celexa, an antidepressant, due to gastrointestinal problems, that she had no improvement in her mood, and that she was experiencing irritability without the Celexa. (Tr. 515.)

On December 28, 2010, plaintiff saw Christopher Montgomery, M.D., family practitioner, for ongoing mood issues. She had been unsuccessful on several antidepressants and Dr. Montgomery prescribed another antidepressant for her to try. (Tr. 400-02.)

On January 13, 2011, plaintiff underwent radiofrequency ablation (RFA), a procedure used to reduce pain whereby an electrical current produced by a radio wave is used to heat up a small area of nerve tissue, thereby decreasing pain signals from that specific area, for her back pain. (Tr. 481-82.)

On January 20, 2011, plaintiff saw Dr. Montgomery for follow-up on her psychiatric medications. She was having difficulty sleeping, which had worsened since receiving the nerve ablation. She also reported excessive heartburn and was concerned the Ranitidine, used to treat gastroesophageal reflux disease (GERD), was not working well. She also reported that Cymbalta, an antidepressant, was causing nausea. Dr.

Montgomery's assessment included low back pain, GERD, hypertension, and depression intolerant to Cymbalta and other medications. Dr. Montgomery discontinued Cymbalta and prescribed Klonopin. He increased the Ranitidine. (Tr. 398-99.)

On January 27, 2011, plaintiff reported to Dr. Fonn that the ablation procedure had provided good relief on her left side, but that she was still experiencing symptoms on her right side. (Tr. 480.)

On March 22, 2011, plaintiff saw Dr. Montgomery for her hypertension which was under control. Her sleep and anxiety had improved with Klonopin. Her acid reflux symptoms had improved but she still had nausea in the mornings. Despite being on hormone replacement therapy, she was also experiencing hot flashes, mood swings, and sweatiness. Dr. Montgomery changed her acid reflux medication and continued Klonopin. (Tr. 397.)

On April 21, 2011, plaintiff saw Dr. Fonn with renewed complaints of back pain. He recommended another course of facet blocks or epidural injections before receiving more ablation therapy. (Tr. 478.)

On May 3, 2011, plaintiff reported her stomach pain had improved but that she still had diarrhea two to four times per week and was constipated with Loperimide, an antidiarrheal. She was encouraged to use another antidiarrheal medication. (Tr. 304-05; 394-95.)

On May 6, 2011, plaintiff received a facet block at L4/5 and L5/S1 for her back pain. (Tr. 351.) She was still experiencing back and leg pain, and on May 12, 2011, Dr. Fonn recommended facet blocks over another RFA treatment. (Tr. 334-35.) She received a facet block treatment that day and again on June 2, 2011. (Tr. 350, 352, 477.)

On June 8, 2011, plaintiff reported to Dr. Fonn that the epidural injections had provided her good relief and that she wanted to hold off on another ablation procedure. (Tr. 333, 475.)

On June 13, 2011, Dr. Fonn discontinued hydrocodone and started plaintiff on Tylenol #3 with codeine. She reported muscle spasms in her back after moving a mattress. (Tr. 331-33, 473-74.)

On August 4, 2011, plaintiff saw Dr. Montgomery for follow-up. Her heartburn and diarrhea had improved. Dr. Montgomery's assessment included hypothyroidism, hyperlipidemia, GERD, hormone deficiency, and hypertension. Dr. Montgomery prescribed Synthroid, used to treat the thyroid, and fish oil. (Tr. 301-03, 391-93.)

On September 6, 2011, plaintiff reported to Dr. Montgomery that she still felt fatigued even after starting Synthroid. (Tr. 299.) On October 8, 2011, Dr. Fonn prescribed Norco (hydrocodone) and Valium. Dr. Fonn recommended an MRI of plaintiff's lumbar spine. (Tr. 329-30, 472.)

On October 18, 2011, plaintiff saw Dr. Montgomery for anxiety and difficulty sleeping. Dr. Montgomery believed that she was moving toward normal thyroid function and was experiencing withdrawal symptoms from Valium and pain medication. (Tr. 293-94.) Dr. Fonn refilled her Norco and Valium. (Tr. 471.)

On October 26, 2011, Dr. Fonn recommended a course of three epidural injections following an MRI. (Tr. 328, 337, 470.) On January 25, 2012, she underwent an injection at L4/5 and L5/S1. (Tr. 348-49.)

On February 13, 2012, plaintiff saw Dr. Montgomery. She had lost 25 pounds with thyroid replacement and her thyroid function was normal. Dr. Montgomery's assessment included hypothyroidism, hyperlipidemia, hypertension, GERD, hormone deficiency, low back pain, and depression. Plaintiff stated she wanted to resume Cymbalta. (Tr. 290-292, 383-84.)

On February 16, 2012, an epidurograph, a procedure used to assess the structure of the epidural space of the spine, showed extravasation or leakage of contrast through the foramen into the epidural space of L4/5 and L5/S1 and confirmed the foraminal stenosis or narrowing seen at this level. On February 23 and 26, 2012, additional epidurography and facet block procedures were performed without complications. (Tr. 344-47.)

On March 8, 2012, plaintiff reported to Dr. Fonn that recent steroid injections had provided excellent relief. (Tr. 327, 469.) On June 13, 2012, Dr. Montgomery evaluated plaintiff's hypertension which was relatively stable. (Tr. 287-89, 381-82.)

On June 14, 2012, Dr. Fonn again ordered another course of three epidural steroid injections which were performed between July 11 and 25, 2012. (Tr. 326, 341-43, 468.) On August 8, 2012, Dr. Fonn noted that recent epidural steroid injections had provided excellent relief. (Tr. 325, 467.)

On September 27, 2012, plaintiff saw Dr. Montgomery, reporting increased fatigue and depression. He increased her Cymbalta. (Tr. 284-86, 379-80).

On November 8, 2012, plaintiff requested additional steroid injections for her back which were administered between November 29 and December 13, 2012. (Tr. 323, 338-40, 465.)

On December 20, 2012, plaintiff saw Dr. Montgomery for sinus problems, blood in her stool off and on for years, and a history of hemorrhoids. She underwent a colonoscopy which revealed small internal hemorrhoids.

On January 22, 2013, plaintiff saw Dr. Montgomery, stating she had to cut back on her pain medication due to constipation. Dr. Montgomery listed her major problem as tobacco use disorder. During a February 5, 2013 visit, Dr. Montgomery noted persistent hypertension, GERD, hormone deficiency, low back pain, rhinitis, depression, hypothyroidism and hyperlipidemia as major problems. (Tr. 273-79, 371-75.)

On March 4, 2013, plaintiff saw Dr. Montgomery and was diagnosed with sinusitis. She was also referred to general surgery for bleeding hemorrhoids. Lab results showed elevated cholesterol and triglycerides. (Tr. 267-72.)

On March 7, 2013, plaintiff saw David Brotman, M.D., who recommended a hemorrhoidectomy which was subsequently performed. (Tr. 320, 429-30.) On March 14, 2013, plaintiff saw Dr. Montgomery for sinusitis. (Tr. 368-70.)

On March 20, 2013, spinal X-rays showed mild to moderate degenerative changes at L4/5 and L5/S1. (Tr. 336.) An MRI on April 1, 2013 showed no significant change

from the previous study. (Tr. 458-59.) Dr. Fonn noted that the MRI revealed concentric disc bulging at L3/4 causing minimal impingement and mild stenosis. (Tr. 507.)

In a Function Report dated April 8, 2013, plaintiff indicated that she was able to shower and dress herself, perform household chores and laundry, shop for groceries, listen to music, and do some gardening. She had no difficulty with personal care. She was able to paint a bedroom slowly, drive, shop for groceries, and use a computer for up to an hour at a time. (Tr. 231-41.)

On May 14, 2013, plaintiff underwent a psychological evaluation by Amber Richardson, Ph.D., a clinical psychologist. Dr. Richardson concluded that plaintiff did not meet the diagnostic criteria for depressive disorder or PTSD as her symptoms appeared to have significantly improved with treatment. She diagnosed plaintiff with amphetamine induced mood disorder and amphetamine dependence in early full remission and assessed a Global Assessment of Functioning (GAF) of 65, denoting mild limitations in social and occupational functioning. (Tr. 354-57.)

On May 28 and June 4, 2013, Dr. Montgomery treated plaintiff for an upper respiratory infection, acute sinusitis, acute bronchitis, allergic rhinitis, and hyperlipidemia. (Tr. 419-22.)

On July 11, 2013, Dr. Fonn recommended another course of three facet blocks at L4/5 and L5/S1 to be followed up with ablation therapy along with physical and aquatic therapy. (Tr. 506.)

On July 22, 2013, plaintiff reported to Dr. Montgomery that she was feeling more depressed. On August 6, 2013, however, she indicated that her mood, sleep and anxiety were better. (Tr. 415-18.)

On September 5, 2013, Dr. Fonn noted that the facet block steroid injections had provided relief and that he planned to proceed with RFA. (Tr. 504.)

On September 9, 2013, plaintiff was diagnosed with bronchitis during an urgent care visit. She was a cigarette smoker and instructed to quit. (Tr. 411-14.) On November 6, 2013, plaintiff was seen in the emergency department at Black River Medical Center

with a cough and shortness of breath and diagnosed with bronchitis. (Tr. 442-57.) She was seen again in the emergency room at Black River Medical Center on December 22, 2013 and diagnosed with an upper respiratory infection and sinusitis. (Tr. 435-41.)

On January 8, 2014, Dr. Fonn recommended another MRI due to recurring back symptoms. (Tr. 503.) She saw Dr. Montgomery the following day. He diagnosed hypothyroidism, hyperlipidemia, hypertension, unspecified leukocytosis, GERD, hormone deficiency, depression, and constipation. (Tr. 407-10.) On January 15, 2014, plaintiff reported to Dr. Patty she was experiencing some rectal bleeding. (Tr. 518.)

On January 20, 2014, an MRI revealed degenerative disc disease at L4/5 with circumferential disc bulging along with a left paracentral disc herniation which produces posterior displacement and possible impingement of the left L5 nerve with the thecal sac. It also showed degenerative disc disease at L3/4 with circumferential disc bulging and very mild posterior disc bulging at the L5/S1 level. (Tr. 433.) On February 5, 2014, Dr. Fonn noted that the recent MRI was "much worse" than the one from 2011 and that surgical intervention, a spinal fusion at L4/5 level, may be indicated. (Tr. 502.)

Plaintiff received additional epidural injections on three occasions between February 28 and March 12, 2014. (Tr. 496-501.)

**ALJ Hearing**

On May 4, 2011, plaintiff appeared and testified to the following at a video administrative hearing before an ALJ. (Tr. 28-67.) She was 49 years old and lives in a house with her disabled husband and two of her three children. She has a valid driver's license. She previously worked at WalMart and in lawn service with her husband. She has been on Medicaid since shortly after she quit working at WalMart in 2009. (Tr. 31-34.)

Plaintiff developed tendinitis while working at WalMart and filed a workers' compensation claim. She attended school through the eighth grade and completed her

GED.  Her back problem developed gradually, not from a specific trauma or incident.  On a typical day, she gets up at 6:00 a.m., helps her sons prepare for school, and drives them to school.  She occasionally washes dishes, vacuums, makes beds, and does laundry, although a home health worker does most of the housework.  She spends a lot of time watching television.  She enjoys gardening and sitting outdoors.  She used to smoke a half pack of cigarettes per day but quit smoking about a month ago.  (Tr. 34-45.)

She takes medication for acid reflux and high blood pressure, both of which are effective.  The medication she takes to treat her irritable bowel syndrome helps somewhat, although she still has diarrhea.  She takes hydrocodone for back pain, as well as diazepam for anxiety.   Since starting hydrocodone her back pain is 5 or 6 on a 10-point scale.  She believes she suffers somewhat from depression, although her concentration is okay.  She can stand for half an hour and lift less than a gallon of milk.  (Tr. 45-47.)

On May 30, 2014, plaintiff appeared and testified to the following at another hearing before an ALJ.  (Tr. 69-90.)  She lives in a house with her two teenage boys and her husband of 35 years who is disabled due to heart disease.  She last worked in 2009 or 2010 in short-term temporary jobs that lasted just a week or so.  She is unable to work due to back problems caused by a bulging disc.   When she pushes herself too hard, she is sore the following day.  She does lots of laundry although it makes her feel sore and stiff.  Cooking and doing dishes causes pain, and she is unable to walk quickly or stand on her feet for long.  When shopping, she tries to limit the distance she walks and brings someone to help her load things in the car.  (Tr. 69-74.)

She takes potassium, an anti-depressant, thyroid medication, and hormone replacement.  She is under stress dealing with family, two teenage boys, and menopause.  She can lift a gallon of milk, but cannot carry it for an hour.  She tries not to lift anything heavier than a gallon of milk or a bag of groceries.  She can stand for 15 minutes before she needs to shift her weight to take the pressure off her back.  She can walk to and from her mother-in-law's home, three houses away.  She can watch a two-hour movie, but

might have to get up at least once. She uses a special chair with a vibrating massage pad because it is more comfortable than standing. She is not very active. She might go outside and walk for 10 or 20 minutes, but she no longer does yard work or garden. She cannot bend or stoop. She spends a lot of time going from her bed to the couch or recliner. She has had injections for her back pain, which worked well initially but became less effective over time. (Tr. 74-77.)

She has had radio frequency ablation twice, which was painful and did not help. She takes hydrocodone and Valium. She has tingling and stinging in her legs and numbness in her toes, which is worse during the winter. She has had problems with irritable bowel syndrome for many years ever since her gall bladder was removed. She has an urgent need to use the bathroom three or four times per week. She had bladder reconstruction or a bladder sling, which stopped her bladder leakage; however, she still has pelvic pain. (Tr. 77-75.)

She has been diagnosed with depression and PTSD. She started taking anti-depressant medication when first diagnosed with PTSD. She became depressed after she lost her job. She has difficulty with memory and concentration; however, she can concentrate for one hour at a time on things that interest her. She can engage in physical activity for only five to ten minutes at a time. (Tr. 81-83.)

A vocation expert also testified at the hearing. The ALJ asked the vocational expert a hypothetical question about an individual with plaintiff's RFC and vocational profile. The vocational expert testified that such an individual could perform light, unskilled jobs such as routing clerk, information clerk, and order caller. (Tr. 84-86.)

### III. DECISION OF THE ALJ

On November 20, 2014, the ALJ issued a decision finding that plaintiff was not disabled under the Act. (Tr. 4-16.) At Step Two, the ALJ found that plaintiff had severe impairments that included degenerative disc disease of the lumbar spine and depression. (Tr. 17.) At Step Three, however, the ALJ found that she did not have an impairment or

combination of impairments listed in or medically equal to one contained in 20 C.F.R. part 404, subpart P, appendix 1. (Tr. 17-19.)

At Step Four, the ALJ determined that plaintiff retained the RFC to lift and carry 20 pounds occasionally; lift and carry 10 pounds frequently; stand and/or walk 6 hours in an 8-hour workday; sit 6 hours in an 8-hour workday; only occasionally balance, kneel, crouch, crawl, stoop, or climb ramps and stairs; never climb ladders, ropes, or scaffolds; and perform only simple, routine tasks. (Tr. 9.) Based on this RFC, the ALJ concluded that plaintiff would not be capable of performing her past relevant work. (Tr. 14.) At Step Five, the ALJ found that plaintiff's impairments would not preclude her from performing work that exists in significant numbers in the national economy, including light, unskilled work as an information clerk, routing clerk, and order caller. (Tr. 24.) Consequently, the ALJ found that plaintiff was not disabled under the Act. (Tr. 11.)

## V.  GENERAL LEGAL PRINCIPLES

The court's role on judicial review of the Commissioner's decision is to determine whether the Commissioner's findings comply with the relevant legal requirements and are supported by substantial evidence in the record as a whole. Pate-Fires v. Astrue, 564 F.3d 935, 942 (8th Cir. 2009). "Substantial evidence is less than a preponderance, but is enough that a reasonable mind would find it adequate to support the Commissioner's conclusion." Id. In determining whether the evidence is substantial, the court considers evidence that both supports and detracts from the Commissioner's decision. Id. As long as substantial evidence supports the decision, the court may not reverse it merely because substantial evidence exists in the record that would support a contrary outcome or because the court would have decided the case differently. See Krogmeier v. Barnhart, 294 F.3d 1019, 1022 (8th Cir. 2002).

To be entitled to disability benefits, a claimant must prove she is unable to perform any substantial gainful activity due to a medically determinable physical or mental

impairment that would either result in death or which has lasted or could be expected to last for at least twelve continuous months.  42 U.S.C. §§ 423(a)(1)(D), (d)(1)(A), 1382c(a)(3)(A); Pate-Fires, 564 F.3d at 942.  A five-step regulatory framework is used to determine whether an individual is disabled.  20 C.F.R. § 416.920(a)(4); see also Bowen v. Yuckert, 482 U.S. 137, 140-42 (1987) (describing five-step process).

Steps One through Three require the claimant to prove: (1) she is not currently engaged in substantial gainful activity; (2) she suffers from a severe impairment; and (3) her condition meets or equals a listed impairment.  20 C.F.R. § 416.920(a)(4)(i)-(iii).  If the claimant does not suffer from a listed impairment or its equivalent, the Commissioner's analysis proceeds to Steps Four and Five.  Step Four requires the Commissioner to consider whether the claimant retains the RFC to perform past relevant work (PRW).  Id. § 416.920(a)(4)(iv).  The claimant bears the burden of demonstrating she is no longer able to return to her PRW.  Pate-Fires, 564 F.3d at 942.  If the Commissioner determines the claimant cannot return to her PRW, the burden shifts to the Commissioner at Step Five to show the claimant retains the RFC to perform other work that exists in significant numbers in the national economy.  Id.; 20 C.F.R. § 416.920(a)(4)(v).

## V.  DISCUSSION

Plaintiff argues the ALJ erred in failing to provide an evidence-based narrative discussion to support his RFC findings.  She also disputes the ALJ's findings regarding the vocational significance of her limited and periodic daily activities, the documented variation in success and effectiveness of medications and other treatments over the period at issue, the documented side effects from medications which required regular adjustments or changes, her need for more aggressive therapies, including frequent steroid injections and radiofrequency ablation, and the significant diagnostic findings as to plaintiff's physical problems.

**Residual Functional Capacity (RFC)**

Plaintiff first argues that the ALJ failed to provide an evidence-based narrative discussion to support his RFC findings. This court disagrees.

RFC is a medical question and the ALJ's determination of RFC must be supported by substantial evidence in the record. Hutsell v. Massanari, 259 F.3d 707, 711 (8th Cir. 2001); Lauer v. Apfel, 245 F.3d 700, 704 (8th Cir. 2001); Singh v. Apfel, 222 F.3d 448, 451 (8th Cir. 2000). RFC is what a claimant can do despite her limitations, and it must be determined on the basis of all relevant evidence, including medical records, physician's opinions, and a claimant's description of her limitations. Dunahoo v. Apfel, 241 F.3d 1033, 1039 (8th Cir. 2001); 20 C.F.R. §§ 404.1545, 416.945(a). While the ALJ is not restricted to medical evidence alone in evaluating RFC, the ALJ is required to consider at least some evidence from a medical professional. Lauer, 245 F.3d at 704. An "RFC assessment must include a narrative discussion describing how the evidence supports each conclusion, citing specific medical facts (e.g., laboratory findings) and nonmedical evidence (e.g., daily activities, observations)." SSR 96-8p, 1996 WL 374184, at *7 (1996).

In this case, the ALJ determined that plaintiff retained the residual functional capacity to lift and carry 20 pounds occasionally; lift and carry 10 pounds frequently; stand and/or walk 6 hours in an 8-hour workday; sit 6 hours in an 8-hour workday; only occasionally balance, kneel, crouch, crawl, stoop, or climb ramps and stairs; never climb ladders, ropes, or scaffolds; and perform only simple, routine tasks. (Tr. 9.)

Plaintiff contends the ALJ's narrative discussion lacks a rationale connecting the actual RFC findings adopted by the ALJ to corresponding record evidence. She asserts that to the extent symptoms are noted, history is recited, or clinical observations are discussed, the ALJ does not explain how or why these things support the specific conclusions regarding functional capacity reflected in the RFC. She argues the ALJ has provided a rationale to discredit her allegations rather than affirmative reasons to support his RFC conclusions.

Plaintiff is incorrect. The ALJ is not required to provide each limitation in the RFC followed by a list of the specific evidence supporting this limitation. See SSR 96-8p. The ALJ's decision here includes a detailed discussion of plaintiff's treatment records from her primary care physician, Dr. Christopher Montgomery, as well as from her neurosurgeon, Dr. Sonjay Fonn, indicating that such evidence was carefully considered. (Tr. 19, 21-22, 190-275, 290-345, 385-430.) The ALJ also considered reports from clinical consultative psychologist Dr. Amber Richardson in assessing plaintiff's mental RFC and concluding that plaintiff could perform simple, routine tasks. (Tr. 13.) Thus, plaintiff's assertion that the RFC is not informed by medical evidence is incorrect.

This court concludes the ALJ properly determined plaintiff retained the RFC to perform a limited range of light work. The ALJ's RFC determination was supported by substantial evidence in the record as a whole.

**Plaintiff's Subjective Complaints**

Plaintiff next argues the ALJ exaggerated the vocational significance of her daily activities and failed to recognize the effectiveness and side effects of medications and treatment, the need for more aggressive treatment, and the objective medical evidence.

This court disagrees. The ALJ articulated a number of compelling reasons for finding that plaintiff's subjective allegations were not credible, all supported by the record evidence.

In assessing a plaintiff's subjective complaints, an ALJ is required to examine (1) the claimant's daily activities; (2) the duration, frequency and intensity of pain; (3) dosage, effectiveness, and side effects of medication; (4) precipitating and aggravating factors; and (5) functional restrictions. Polaski v. Heckler, 739 F.2d 1320, 1322 (8th Cir. 1984). An ALJ may disbelieve a claimant's subjective reports due to inherent inconsistencies or other circumstances. Travis v. Astrue, 477 F.3d 1037, 1042 (8th Cir. 2007). "If an ALJ explicitly discredits the claimant's testimony and gives good reason for

doing so, the Court should defer to the ALJ's credibility determination." See Gregg v. Barnhart, 354 F.3d 710, 713 (8th Cir. 2003).

The ALJ here identified many reasons to support his findings concerning plaintiff's subjective complaints, including plaintiff's poor work history, her daily activities, the effectiveness of her medications, medical record evidence documenting improvement, and the lack of support by an examining psychologist. (Tr. 21-22.)

The ALJ noted plaintiff's history of low earnings, specifically, no reported earnings from 1992 through 2003. (Tr. 21, 133.) See Bernard v. Colvin, 774 F.3d 482, 489 (8th Cir. 2014) (ALJ may consider plaintiff's sporadic work history as a factor weighing against her credibility); Mabry v. Colvin, 815 F.3d 386, 392 (8th Cir. 2016) (poor work history may show a claimant's lack of motivation to work). Moreover, during the alleged period of disability, plaintiff's medical records consistently described her as a homemaker, suggesting she may have been out of the workforce by personal choice, rather than due to medical impairment. (Tr. 270, 273, 277, 282, 299, 302, 369, 371.) The ALJ also noted there was no sudden-onset injury or specific medical impairment causing her departure from the workforce in 2009. (Tr. 21.) See Medhaug v. Astrue, 578 F.3d 805, 816-17 (8th Cir. 2009) (it is relevant to a claimant's credibility that she stopped working for reasons other than her medical condition).

The ALJ also noted that plaintiff's daily activities were not consistent with her allegations of wholly disabling impairments. (Tr. 21.) In her Function Report, plaintiff indicated that she was able to shower and dress herself, do household chores and laundry, shop for groceries, listen to music, and do some gardening. She had no difficulty with personal care. She was able to paint a bedroom, albeit slowly, drive, shop for groceries, and use a computer for up to an hour at a time. No physician ever imposed long-term limitations on her ability to stand, sit, walk, lift, carry, or do other basic exertional activities. (Tr. 21, 231-41.)

Plaintiff also makes a general argument disputing the ALJ's findings regarding the vocational significance of plaintiff's limited and periodic daily activities, the documented

variation in success and effectiveness of medications and other treatments over the period at issue, the documented side effects from medications which required regular adjustments or changes, the need for more aggressive therapies including frequent steroid injections and radiofrequency ablation, and the significant diagnostic findings as to plaintiff's physical problems.

However, plaintiff does not identify specific errors by the ALJ or point to record evidence to support her argument. Nor does she cite legal authority in support of her argument. Plaintiff asserts that ALJ exaggerates the "vocational significance" of her daily activities. The regulations provide, and the Eighth Circuit holds, that a claimant's daily activities are properly considered in the credibility analysis. See Johnson v. Apfel, 240 F.3d 1145, 1148 (8th Cir. 2001) (activities that are inconsistent with a claimant's allegations of disability undermine the claimant's credibility). She also references the variation in success and effectiveness of medications and treatments. The record evidence, however, shows plaintiff had good relief with steroid injections. (Tr. 321-23, 325, 327, 333, 465, 467, 469, 475, 495, 501-04.) Antidepressants were generally effective in treating her depression and anxiety. (Tr. 396, 413, 415-16, 427.) While plaintiff alludes to documented side effects of medication as inconsistent with the ALJ's credibility assessment, the record evidence shows plaintiff's medications caused few, if any, side effects. (Tr. 23, 184, 214, 307, 320, 353, 519-200.) Plaintiff also notes the need for increasingly aggressive therapies, such as steroid injections and radiofrequency ablation. However, as discussed above, plaintiff underwent radiofrequency ablations and steroid injections even prior to the relevant period of consideration, which does not establish the need for increasingly aggressive therapies.

Plaintiff also references the objective medical findings, including her MRI results. The ALJ acknowledged that an MRI from February 2014 showed increased herniation from earlier studies in 2009 and 2011. (Tr. 22.) The ALJ also observed that there was no record evidence suggesting plaintiff required surgery or that the injections were not providing adequate relief. (Tr. 22.)

Credibility questions concerning a claimant's subjective testimony are primarily for the ALJ to decide, not the courts. See Baldwin v. Barnhart, 349 F.3d 549, 558 (8th Cir. 2003). When the ALJ articulates inconsistencies in the record that call into question the plaintiff's subjective complaints, the ALJ's credibility determination should not be disturbed. See Eichelberger v. Barnhart, 390 F.3d 584, 590 (8th Cir. 2004) (reviewing court will not substitute opinion for that of the ALJ who is in better position to assess credibility). This court concludes the ALJ's determination that plaintiff's testimony regarding the extent of her limitations was not fully credible comports with the requirements of Polaski and is supported by substantial evidence in the record as a whole.

## VI. CONCLUSION

For the reasons set forth above, the decision of the Commissioner of Social Security is affirmed. An appropriate Judgment and Order is issued herewith.


        /s/ David D. Noce  
**UNITED STATES MAGISTRATE JUDGE**

Signed on January 31, 2017.